Marcus L. NANCE et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Northern Cheyenne Tribe et
al., Intervenors.

THERMAL ENERGY, INC. et
al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Northern Cheyenne Tribe et
al., Intervenors.

AMAX COAL COMPANY, Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Northern Cheyenne Tribe et
al., Intervenors.

CROW INDIAN TRIBE, MONTANA,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Northern Cheyenne Tribe, Intervenor.

WESTMORELAND RESOURCES,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Northern Cheyenne Tribe, Intervenor.

WESTMORELAND RESOURCES,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Northern Cheyenne Tribe, Intervenor.

Nos. 77–3058, 77–3301, 77–3305, 77–3356,
77–3374 and 79–7261.

United States Court of Appeals,
Ninth Circuit.

Argued March 4, 1980.

Submitted April 24, 1981.

Decided May 18, 1981.

Bruce M. Brown, Brown & Huss, Miles City, Mont., on brief, for Nance.

Jack L. Smith, Denver, Colo., on brief, for Thermal Energy, Inc.

Gary L. Green, Dwason, Nagel, Sherman & Howard, Denver, Colo., on brief, for Amax Coal Co.

Thomas K. Schoppert (argued), Lynaugh, Fitzgerald & Skaggs, Billings, Mont., on brief, for Crow Tribe.

George J. Miller, Philadelphia, Pa., on brief, for Westmoreland.

Charles W. Hingle, Lynaugh, Fitzgerald & Skaggs, Billings, Mont., James W. Moorman, Nancy Long, Angus Macbeth, Washington, D. C., on brief; Earl Salo, Bruce J. Terris, Washington, D. C., argued, for appellee EPA.

David R. Sturges, David Mastbaum, Denver, Colo., on brief, for intervenor.

Frederick E. Watson, San Francisco, Cal., William E. Murane, Holland & Hart, Denver, Colo., James R. Bieke, Shea & Gardner, Washington D. C., argued for appellant.

Before TANG, SCHROEDER and NELSON, Circuit Judges.

NELSON, Circuit Judge:

In this case, petitioners challenge the approval by the Environmental Protection Agency (EPA) of the Northern Cheyenne Tribe's redesignation of its reservation from Class II to Class I air quality standards. The major issue presented can be rather simply described. When an agency takes administrative action expressly on the then correct assumption that the action will not affect the rights of various parties, some of whom actively intervene in the proceedings, and immediately after such action becomes final a law is passed which causes the administrative action to have a potential direct effect of the sort it was previously expressly asserted it would not have, is such administrative action thereby rendered arbitrary and capricious or otherwise invalid?

We hold that the EPA's action was not arbitrary or capricious and, therefore, affirm the Agency's approval of the Northern Cheyenne Tribe's redesignation of its reservation from Class II to Class I air quality standards. Further, we affirm the denial by the EPA of the petition by Westmoreland Resources to vacate EPA approval of the redesignation and to remand the redesignation question to the Northern Cheyenne for reconsideration. Petitioners assert numerous other flaws in the proceedings which, they contend, require this court to overturn the EPA action. For reasons given below we are compelled to reject these contentions.

### Statement of Facts

The facts are particularly crucial in this case because of the importance of the timing of the various events. Pursuant to the decision in *Sierra Club v. Ruckelshaus*, 344 F.Supp. 253 (D.D.C.1972), *aff'd* 4 Envir.Rep. 1815 (D.C.Cir.), *aff'd by an equally divided court sub. nom. Fri v. Sierra Club*, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973), the EPA promulgated regulations (PSD regulations) designed to prevent the significant deterioration of the air quality in areas cleaner than required by the national secondary air quality standards. 40 C.F.R. § 52.21 (1975). These PSD regulations were published on December 5, 1974. Under these regulations, all areas of the country which had cleaner air than required by the national standards were to be designated as Class I, Class II, or Class III. All clean air areas were initially designated as Class II, under which a moderate amount of deterioration of air quality would be allowed, but procedures were provided by which such areas could be redesignated Class I, under which very little deterioration and hence very little development is allowed, or Class III, under which the quality of the air in the area may deteriorate to the national secondary air quality standards. Specific procedures were provided by which an Indian Tribe governing body could redesignate its reservation from Class II to either Class I or III. 40 C.F.R. § 52.21(c) (1975).

The Tribal Council of the Northern Cheyenne Tribe, Intervenors in this action, decided on May 3, 1976, to request the EPA administrator to reclassify the reservation from Class II to Class I. On May 13, the Tribe advised the EPA of the proposed redesignation, and formally confirmed its proposal by letter dated July 9, 1976. After

notifying various federal, state, and local officials, as well as certain citizens' groups, the Tribe began preparation of a report which was to discuss the social, environmental, and economic effects of the proposed redesignation. Volume I of this report, "The Northern Cheyenne Air Quality Redesignation Report and Request," was issued on December 11, 1976, and comprised well over 200 pages. Following distribution of this report to various agencies and interested parties, and notification of a public hearing on the proposed redesignation, such hearing was held in Lame Deer, Montana, on January 17, 1977. On March 7, 1977, the Tribe formally submitted its proposal for redesignation to the EPA, accompanied by a final report, the hearing transcript, and written comments and responses.

EPA regulations then in force required the agency to take action on such a redesignation proposal within 90 days, 40 C.F.R. § 52.21(c)(3)(vi) (1975), in this case by June 5, 1977. On April 29, 1977, EPA published notice that it intended to approve the redesignation of the Northern Cheyenne Reservation to Class I, and solicited comments on such redesignation through May 31, 1977. On June 10, 1977, the EPA Administrator announced that the time for receiving public comments would be extended until June 30, 1977. On August 5, 1977, the Administrator published his approval of the redesignation, effective immediately, which was accompanied by a 51-page "EPA Support Document" detailing the reasons for such approval. 42 Fed.Reg. 40695 (1977).

Petitioners assert the following grounds for overturning the action of the EPA in this case: (1) The decision of the Cheyenne Tribe to redesignate the reservation as a Class I area and the EPA's subsequent approval of that proposal were arbitrary and capricious insofar as they failed to consider the effects of such redesignation on strip mining; (2) The redesignation was ineffective because of lack of publication prior to the enactment of the 1977 Clean Air Act Amendments, and hence the purported redesignation was not ratified by those amendments; (3) The EPA violated its own regulations in failing to obtain the Secre-

tary of the Interior's approval of the redesignation on behalf of Indian trust lands affected, or, in the alternative, the EPA breached the United States' trust obligations to the Indians; (4) The Cheyenne Tribe support document was insufficient under the EPA's regulations; (5) The Clean Air Act did not authorize the delegation to Indian Tribes of the power to redesignate their reservations, and if it did so authorize, it was unconstitutional; (6) The redesignation effected a taking of the petitioner's coal mining interests without due process and without just compensation in violation of the fifth amendment to the Constitution; (7) The delegation to the Indian governing bodies of redesignation authority which affected land use outside the reservation area violated the tenth amendment to the Constitution.

*Standard of Review*

■ Judicial review of the Administrator's action in this case is governed by section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(D). Under this section, we must determine whether the EPA's approval of the redesignation proposal by the Northern Cheyenne is invalid as arbitrary, capricious, or an abuse of discretion, *id.* § 706(2)(A), or unconstitutional, *id.* § 706(2)(B), or in excess of legislative authority, *id.* § 706(2)(C), or procedurally defective, *id.* § 706(2)(D). With respect to review under the "arbitrary and capricious" standard, the reviewing court is limited to deciding whether there has been a clear error of judgment by the agency and whether the agency action was based on a consideration of the relevant factors. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1970).

I

*Were the Northern Cheyenne's Decision to Redesignate and the EPA's Approval of that Proposal Arbitrary and Capricious*

Petitioner's primary complaint is that it was arbitrary and capricious for the North-

ern Cheyenne Tribe to redesignate its reservation, and subsequently for the EPA to approve such redesignation, without considering the impact of the redesignation on strip mining in the surrounding area.

It is undisputed that under the regulations in effect at the time the redesignation was proposed, only 19 sources of pollution were subject to permit procedures, and that these sources did not include strip mines. In a meeting sometime before the end of October, 1976, EPA representatives assured the Coordinator of the Northern Cheyenne Research Project that sources not specifically covered by the regulation would not be affected. On October 29, 1976, the Coordinator wrote to the EPA Regional Administrator:

In a recent meeting with representatives of your office . . ., we were assured that a Class I designation . . . would affect only those point sources listed in the regulations. Simply put, this would mean that point sources not listed, such as mining operations, . . ., etc., are not covered by PSD regulations. This matter has been clouded in our minds for some time and we feel relieved to know the agency's position.

The Regional Administrator responded to a request for written documentation of its position in a letter of November 4, 1976:

. . . . [The letter of October 29] asks for verification of [the EPA representative's] interpretation of what sources are affected by the PSD regulation. As was indicated verbally, operations such as mining, highway construction, and slash burning are not among the 19 point source categories requiring a permit to construct under the PSD regulation. It should be noted, however, that when one of the 19 PSD sources is under consideration for a permit, the impact of any operation, such as mentioned . . ., coming into existence after January 2, 1975 must be included in evaluating the increment available.

It was repeatedly emphasized both in the December, 1976 "Northern Cheyenne Air Quality Redesignation Report and Request" and at the January, 1977, hearings, as well

as in response to written comments, that mining would not be covered by the PSD regulations. In the April 29 publication of the notice of proposed approval of the redesignation the EPA specifically noted that "[s]ince coal mining is not one of the nineteen source categories requiring preconstruction review, and hence would not require a PSD construction permit, redesignation of the Northern Cheyenne Reservation would not directly affect mining either on the reservation or in areas adjacent to the reservation," 42 Fed.Reg. 21820 (1977), and in the August 5, 1977, notice of approval reiterated that "[s]ince strip mines are not subject to the preconstruction review program of the PSD regulation, they would not be directly affected by a redesignation." 42 Fed.Reg. 40697 (1977). It is not disputed that, according to the regulations then in force, the above statements were correct.

Thus, it is clear that the Northern Cheyenne Tribe and the EPA did consider whether strip mining would be affected by the redesignation. The EPA and the Tribe concluded, on the basis of the regulations then in effect, that strip mining would not be affected.

Petitioner's real complaint is with the effect of the redesignation when coupled with the Clean Air Act Amendments of 1977. These amendments added to the sources covered by the preconstruction review program any source emitting in excess of 250 tons of *any* pollutant per year. Section 162(a) of the Amendments provided that any areas designated Class I prior to the enactment of the statute would remain Class I under the statute. 42 U.S.C. § 7472. The Northern Cheyenne Reservation was the only such area. Petitioners and intervenors (other than the Cheyenne Tribe) assert that the EPA and Cheyenne Tribe should have taken account of the pending legislation in redesignating the reservation and that their failure to do so was arbitrary and capricious. Analysis of this claim requires a chronology of the enactment of the Amendments into law.

The origins of the 1977 Clean Air Act Amendments are to be found in a 1976 bill

which was reported by the conference committee but died as a result of a filibuster in the Senate. *See* 122 Cong.Rec. S17568–70, S17573–4. A new bill was introduced in 1977 which passed the House of Representatives on May 26, 1977. On June 10, 1977, the Senate passed an amended version of the bill. *See* 123 Cong.Rec. 18515 (1977). The Conference Committee reported the bill to both the House and the Senate on August 4, 1977, and both houses approved it the same day. 123 Cong.Rec. 26856, 27079 (1977). The EPA approved the redesignation on the following day, August 5. Actual publication of EPA approval took place one week later. The President signed the 1977 Clean Air Act Amendments into law on August 7, 1977.

There are several flaws in the petitioners' theory that the Tribe and the EPA were required to take this legislation into account in considering the proposed redesignation by the Cheyenne Tribe. First, it is far from clear that strip mining will ever be subject to PSD regulation. The PSD permit procedure applies to any source which emits more than 250 tons per year of any pollutant, but there has been considerable dispute as to the meaning of "source" and whether it includes such facilities as stripmines. Furthermore, it is not clear to what extent the EPA is required or has discretion to consider fugitive emissions as part of this 250 tons. The inclusion of fugitive emissions (i. e. emissions from a facility that escape other than from a point source) in meeting the 250 tons per year threshold is important to this case because fugitive particulate emissions are the primary pollutant released from surface mines. If fugitive emissions are excluded, it is doubtful that stripmining will be subject to PSD review.

■ Two recent events make these ambiguities in the legislation manifest. First, the District of Columbia Court of Appeals decided *Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C.Cir.1979). In *Alabama Power*, the court considered, inter alia, whether the EPA may include fugitive emissions in determining whether a source emits more than 250 tons a year of pollutants. Al-

though the court upheld EPA's position that sources of fugitive emissions were encompassed in the PSD provisions, it found that section 302(j) "specifically attaches a rule-making requirement for the inclusion of fugitive emissions" in the calculation whether an emitting facility qualifies as "major". At 369. This rulemaking requirement was found to apply to the "catch-all" provision of section 169(1), which subjects sources producing greater that 250 tons of fugitive emissions per year to PSD permit procedures. *Id.* at 369–370. The effect of *Alabama Power* is to require the EPA to engage in legislative rulemaking before fugitive emissions from strip mining can be considered in determining whether the source emits more than 250 tons per year.

*Alabama Power*, therefore, lends support to the conclusion that the 1977 Clean Air Act Amendments were indeed ambiguous as to whether strip mining is subject to PSD regulations. This conclusion is buttressed by the EPA's response to the *Alabama Power* decision. The EPA has issued a rule that includes fugitive emissions in determining whether a source is major only for 26 specified types of sources. Strip mining is not one of these 26 sources. 45 Fed.Reg. 52690 (1980). Thus, under present regulations governing fugitive emissions, strip mines are not to be subject to PSD review unless non-fugitive emissions exceed 250 tons per year. *See* 45 Fed.Reg. 52690 (1979).

A second reason why it is unclear that the EPA should have taken the proposed Amendments into account is the uncertainty as to when enactment became sufficiently probable as to require its consideration. The earliest date at which the bill took a fairly final form was upon its reporting by the Conference Committee on August 4, 1977. Even then, the bill might have been subject to further amendment, filibuster, or even defeat. It does not appear either from the record or from the many briefs presented to this court that passage of the Clean Air Act Amendments in their final form was assured at any time significantly before August 4.

On the other hand, the fact remains that EPA approval was not filed until August 5, 1977, the day after both houses of Congress had approved the amendments. Moreover, contrary to usual procedure, the approval was made effective immediately, even though notice was not published until August 11, four days after the President had signed the bill.

■ The conclusion is thus compelled that on the date the EPA finally approved the redesignation, it knew that the 1977 Clean Air Act Amendments would be passed and signed into law. The question before this court is whether, in light of that knowledge, the EPA's approval of the redesignation was arbitrary and capricious. Two reasons for concluding that it was not were stated above: (1) strip mining is still not subject to PSD regulation under the 1977 Amendments to the Clean Air Act, and (2) the final form of the 1977 Amendments was not assured until the bill was reported from the Conference Committee on August 4, 1977.

A third reason is that the EPA was not certain the Amendments would be passed and signed into law until well after all agency action preliminary to final approval, all comments, and all hearings had occurred, and well after final agency action was both expected and required by regulations. The decision of the Supreme Court in *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), makes clear that there must be an end to the period during which the agency must reopen the record to consider new facts. The Court quoted from its earlier opinion in *ICC v. Jersey City*, 332 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944):

> Administrative consideration of evidence ... always creates a gap between the time the record is closed and the time the administrative decision is promulgated [and, we might add, the time the decision is judicially reviewed] .... If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has aris-

en, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. 435 U.S. at 554–55, 98 S.Ct. at 1217. This is not to say that pending legislation should never delay or influence the administrative process. But it is for the agency, not for this court, to decide whether the proceeding should be reopened to consider such pending legislation, unless the failure to reconsider is "arbitrary and capricious." *See Northern Lines Merger Cases*, 396 U.S. 491, 520–21, 90 S.Ct. 708, 722, 24 L.Ed.2d 700 (1949); *City of Santa Rosa v. EPA*, 534 F.2d 150, 153 (9th Cir. 1976). All that need be held here is that there the effect of legislation on future agency action is unclear, and passage of the legislation is not assured until after all action preliminary to the agency rendering a final decision has been taken, and the time has passed during which the agency would normally be required to render that final decision, it was not arbitrary and capricious for the agency to approve a proposed change in air quality standards that did not take account of pending legislation.

## II

### Was the Redesignation Effective on Approval

■ Petitioners argue that the redesignation was not effective prior to the enactment of the 1977 Clean Air Act Amendments and was, therefore, not ratified by those amendments. This dispute revolves around whether the redesignation could be made effective immediately upon approval, and before actual publication and a 30 day period for notice. Under the Administrative Procedure Act, a substantive rule must be published 30 days before its effective date except "as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C. § 553(d).

The legislative history of 5 U.S.C. § 553(d) indicates that the primary purpose of the provision was not to encourage prepublication dialogue, but rather to permit

petitions for reconsideration and "to 'afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take other action which the issuance may prompt.'" *United States v. Gavrilovic*, 551 F.2d 1099, 1104 (8th Cir. 1977) (*quoting* S.Rep.No.752, 79th Cong., 1st Sess. 15 (1946); H.R.Rep.No.1980, 79th Cong., 2d Sess. 25 (1946)). In determining whether good cause exists, an agency, and a reviewing court, should consider whether the necessity for immediate implementation outweighs any hardship affected persons might experience because of the reduced time to adjust to the new rule. *See id.* at 1105.

In the publication of its approval, the EPA asserted that there was good cause for making the action effective immediately because the EPA had "been holding in abeyance a preconstruction permit request pending final action" and "no useful purpose would be served by deferring the effectiveness of this action for thirty days because new applications for construction would have to be evaluated in light of this action in any event." 42 Fed.Reg. 40695 (1977). Petitioners argue that these reasons given by the EPA are insufficient to constitute good cause.

■ The EPA, however, neglected to mention what was undoubtedly its primary motivation: to assure that the redesignation was effective prior to enactment and thus remained effective under the amendments. This latter purpose may be considered by the court inasmuch as it was implicit in the explicitly stated justification and was additionally, as asserted by the petitioners, obvious from the circumstances. *See Texaco Inc. v. FEA*, 531 F.2d 1071, 1082–83 (Em.App.1976); *State of California v. Simon*, 504 F.2d 430, 439 (Em.App.1974). Much time and effort had gone into these redesignation proceedings, and if the redesignation were not effective immediately, the proceedings would have to be undertaken again. Furthermore, immediate effectiveness was necessary to avoid undue prejudice and hardship to the Northern Cheyenne Tribe, since, according to the EPA's own regulations the redesignation should have been approved long before.

Because the petitioners in this case were aware of the proposed redesignation and suffered almost no adverse effects as a result of the noncompliance with the thirty-day requirement, their hardship was outweighed by the Agency's need to put the order into immediate effect. *See Kollett v. Harris*, 619 F.2d 134, 144–45 & n. 15 (1st Cir. 1980) (despite complete noncompliance with 5 U.S.C. § 553(d), good cause was found where regulations were needed to implement new legislation and no prejudice was demonstrated). Thus, good cause existed excusing the failure to comply with 553(d) and the redesignation was effective on the date of publication.

Petitioners cite *Texaco Inc. v. FPC*, 412 F.2d 740 (3rd Cir. 1969) for the proposition that when major legislation is imminent that promises to alter significantly the impact of a proposed administrative rule, the agency should be charged with a duty to utilize the 30-day period to "educate itself" about the combined effect of the rule and the legislation. As Respondents point out, however, *Texaco* can be distinguished because in that case the Federal Power Commission failed to provide notice or a hearing before promulgating an order, 412 F.2d at 742–43. In this case, petitioners suffered no adverse effect because of their failure to receive notice of the final ruling immediately, and indeed had been notified in advance that the redesignation would be effective upon approval. 42 Fed.Reg. 21819 (1977). For these reasons we hold that the EPA could make its decision effective upon approval on August 5, 1977.

### III

(a) *Did the EPA violate its own Regulations by Failing to Obtain the Approval of the Secretary of the Interior*

■ Several intervenors, and in particular the Crow Tribe, argue that the EPA did not follow its own regulations requiring it to obtain approval from the Department of the Interior for actions affecting Indian Trust lands. 40 C.F.R. § 52.21(c)(3)(v) (1975) provides in part:

Where a State has not assumed jurisdiction over an Indian Reservation the appropriate Indian Governing Body may submit to the Administrator a proposal to redesignate areas Class I, Class II, or Class III, provided that:

. . . .

(b) Such redesignation is proposed after consultation with the State(s) in which the Indian Reservation is located or which border the Indian Reservation and, for those lands held in trust, with the approval of the Secretary of the Interior.

The Crow contend that the EPA failed to obtain the requisite approval by the Secretary of the Interior. The facts appear to be as follows. On March 21, 1977, two weeks after formal submission of the redesignation proposal, the EPA received a letter from the Northern Cheyenne Agency of the Bureau of Indian Affairs, Department of the Interior, which noted that EPA regulations required approval of the Secretary of the Interior for the proposed redesignation. In that letter, the Superintendent of the Northern Cheyenne Reservation reaffirmed the "Agency's endorsement of the subject Tribal resolution", and added that if such action did not meet the EPA requirements, clarification should be sought from the Office of the Secretary of the Interior. In its April 29, 1977, notice of proposed approval of the redesignation, the EPA noted its doubts that this communication satisfied the procedural requirements and added that it was seeking further clarification before reaching a final decision. 42 Fed.Reg. 21820 (1977).

On May 9, 1977, the Administrator wrote to the Secretary of the Interior requesting such clarification. The letter stated that the EPA was "requesting clarification regarding whether the Tribal Council is proposing the redesignation with the approval of the Secretary of the Interior as required by our regulation." Undersecretary James A. Joseph responded to this letter on June 23, 1977. The key passage follows:

In the instant case the tribal council sought and received the consent of the Agency Superintendent to forward the proposal to EPA to satisfy the requirement of 40 CFR 52.21 that the Secretary of the Interior approve submission of the proposal. The Agency Superintendent has the authority to act in behalf of the Secretary in approval of tribal leases, acceptance of tribal resolutions and ordinances, and approval of matters such as the one at issue, by virtue of a series of delegations of authority from the Secretary. [citations omitted]

We hold the above communications sufficient to meet the requirement that the redesignation be approved by the Secretary of the Interior.

(b) *Did the EPA Fulfill' the United States' Trust Obligations to the Crow Tribe*

■ A separate question is whether the EPA violated the federal government's trust obligations to the Indians. Supreme Court decisions require the trust obligation owed by the United States to the Indians be exercised according to the strictest fiduciary standards, *United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973); *Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). The Crow Tribe claims that the EPA, in failing to consider the interests of the Crow, neglected these fiduciary obligations. The following facts are relevant to this claim.

■ In the above mentioned letter of June 23, 1980, Undersecretary of the Interior, James A. Joseph, also informed the EPA of certain concerns of the Crow Tribe regarding the potential effect of a redesignation of the Northern Cheyenne territory. The Crow Tribe has raised certain trust concerns regarding the effect on the Crow Reservation of the Northern Cheyenne proposal to redesignate their air quality standards. The United States has a trust responsibility to Indian Tribes, separate and apart from the requirements of 40 CFR 25.21.

The Crow Tribe is concerned about the effect the Northern Cheyenne redesignation will have on Crow development, and

whether they will have to seek Northern Cheyenne approval before implementing development plans. Inasmuch as EPA has the necessary technical expertise to review the impacts on both Tribes as interrelated actions, this Department feels that the United States' obligation to the Tribes would best be satisfied by such review.

If a redesignation is to be made, we would appreciate being informed of the impact and alternatives available to the respective Tribes before final action is taken.

Furthermore, counsel to the Crow Tribe wrote to the Regional Office of the EPA on June 12, 1977, requesting that the EPA "proceed in a trustee or fiduciary relationship with regards to the [Northern Cheyenne] redesignation as to the Crow Tribe." Although no response to this letter is in the record, on August 5, the date the EPA approved the redesignation, the Administrator wrote to the Secretary of the Interior as follows:

In his June 22, 1977, letter Undersecretary James A. Joseph suggested that EPA review the impacts of the redesignation upon Crow development. In the absence of an official protest from the Crow Tribe, EPA's authority to review these impacts and use the results as criteria for approval or disapproval of the proposed redesignation are limited. However, the Northern Cheyenne did evaluate the potential impacts and, as discussed in the enclosed documentation, the impacts upon Crow development should not be significant.

Two questions are presented by this set of facts. First, was the EPA required to proceed in a Trustee capacity vis a vis the Crow Tribe, and second, if it was so required, did it fulfill that obligation? It is fairly clear that *any* Federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes. *See Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). As a result of the letters from the Undersecretary of the Interior, and the Crow Tribe, and the failure of the EPA to respond to those letters before approving the redesignation, the responsibility to exercise those fiduciary obligations is fairly placed upon the EPA.

So, we must consider whether the EPA fulfilled the United States' fiduciary obligations toward the Crow Tribe. Preliminarily, we note that adequate procedures were provided by the Clean Air Act and the EPA regulations to fulfill this responsibility. The Crow Tribe was consulted by the Northern Cheyenne before redesignation was proposed and it had full opportunity to participate in the public hearing. Moreover, all the Crow Tribe was required to do activate the full panoply of protection against a redesignation that would adversely affect its interest was to lodge an official protest against such redesignation. 40 C.F.R. § 52.21(c)(3)(vi)(e) (1975). This they did not do.

■ Despite the adequacy of procedural protections, the question remains whether the EPA in substance fulfilled its trust obligations. The primary concern of the Crow from the beginning of the redesignation procedure was clearly the potential impact of such a redesignation on their ability to mine coal. It is in this respect that they now claim that the EPA failed to exercise its trust responsibilities. However, in specifically finding that the redesignation would not, under the law as it stood at that time, have any effect on strip mining, the EPA adequately addressed the Crow's interest in this regard. That the assumption may have turned out as a result of subsequent events to have been wrong does not affect the answer to the question of whether the fiduciary responsibilities were fulfilled in the first place.

In addition, it must be noted that the Government also has a fiduciary relationship with the Northern Cheyenne Tribe. That tribe has an interest in avoiding further delay before EPA action on the proposed redesignation. In light of these conflicting fiduciary responsibilities and the strong possibility that the Crow tribe would not be prejudiced at all by EPA approval of

the redesignation, we cannot say that there was a breach of the fiduciary duty to the Crow.

## IV

### Was the Cheyenne Tribe Support Document Insufficient under EPA Regulations

■■■ Petitioner Westmoreland Resources argues extensively that the PSD Analysis Document prepared by the Tribe in support of the redesignation failed to comply with the regulations of the EPA. Westmoreland argues in particular that the Analysis Document failed to consider the effect of the redesignation on energy development, that it failed to quantify the effect on air quality, that it gave inadequate consideration to the growth anticipated in the area, and that it failed to consider alternatives such as delay. No claim is made that these factors were not considered at all, only that they were not "adequately considered". Thus, the standard of review on appeal is limited to whether the Tribe's consideration of those factors was somehow "arbitrary or capricious." Under that standard of review, the Tribe has met its obligations.

Westmoreland relies heavily on various exacting requirements that have been imposed for the preparation of Environmental Impact Statements (EIS) under the National Environmental Policy Act (NEPA). Actions under the Clean Air Act, however, are expressly exempted from the requirement of the preparation of an EIS. 15 U.S.C. § 793(c)(1). Furthermore, the Clean Air Act contains a strong presumption in favor of the maintenance of clean air, and the nature of a decision which simply requires that the air quality be maintained at a certain level prevents any exact prediction of its consequences. The Tribe has considered the factors enumerated in EPA regulations, and its choice in favor of the certainty of clean air is a choice supported by the preferences embodied in the Clean Air Act.

## V

(a) *Did the EPA Violate the Clean Air Act by Delegating Redesignation Authority to the Indian Governing Bodies*

■■■ Certain petitioners argue that the delegation of authority to the Indian governing bodies was a violation of the Clean Air Act, and if it was not a violation then it was unconstitutional. The statutory question was found not ripe for review in *Sierra Club v. EPA*, 540 F.2d 1114, 1139 (D.C.Cir.1976), *vacated and remanded* 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977). Both the EPA and the Tribe argue that this court does not have jurisdiction to review the validity of the redesignation regulations either under the statute or the Constitution. First, they point to section 307(b)(1) of the 1977 Amendments, which requires that petitions for review of any nationally applicable regulations promulgated by the EPA Administrator be filed in the United States Court of Appeals for the District of Columbia. 42 U.S.C. § 7607(b)(1). But there is no indication in either the wording of the provision or its legislative history, that it applies to regulations promulgated before the enactment of the 1977 amendments. We think that review of the pre-1977 regulations may be undertaken in accordance with the provisions then in force. Moreover, the EPA recognizes this by its reliance upon the Sixth Circuit's decision in *Dayton Power & Light Co. v. EPA*, 520 F.2d 703 (6th Cir. 1975). The EPA cites that case for the proposition that only the District of Columbia Circuit has jurisdiction to review the PSD regulations. This seriously misstates the holding. The Sixth Circuit ruled that review of the PSD regulations was governed by the second sentence of then 42 U.S.C. § 1857h–5(b)(1), which provides that review "may be filed only in the United States Court of Appeals for the appropriate circuit." 520 F.2d at 706. The Court then determined that, because of the potential for conflicts between the circuits and the need for uniform national laws, the District of Columbia Circuit was the appropriate circuit to review the PSD regulations, par-

ticularly in light of the fact that the regulations were promulgated in response to a decision by that court. 520 F.2d at 708. While the District of Columbia Circuit subsequently upheld the validity of the PSD regulations applicable to the states, it declined to decide the question of the Indian lands redesignation provisions on grounds of ripeness. *Sierra Club v. EPA*, 540 F.2d at 1114. That question is undoubtedly now ripe for adjudication, the actual redesignation of an area by an Indian Tribe being the very issue in this case.* Under *Dayton Power* this Court must decide whether it is the appropriate Court of Appeals to review the PSD regulations applying to Indian Tribes.

 It should be noted at the outset that, accepting the ripeness requirement imposed by the D.C. Circuit in *Sierra Club*, the redesignation of the Northern Cheyenne Reservation is the only context in which the pre-1977 regulations applicable to tribal redesignation may ever be challenged. As noted above, this reservation was the only area in the country actually redesignated under those regulations, and thus also the only Indian land so redesignated. So, there will be no opportunity for conflict among the circuits, or for the wasting of judicial resources, the factors which were determinative in *Dayton Power*. Moreover, the only land that has been affected or that can be affected (since the regulations are no longer applicable) is located in this circuit. These facts suggest that this is the appropriate circuit to review this appeal.

Petitioners' argue that the PSD regulations delegating redesignation authority to Indian governing bodies violated the Clean Air Act. Petitioners urge that section 107(a) of the Clean Air Act, 42 U.S.C. § 7407(a), delegated the responsibility to the states for assuring air quality within the entire geographic area comprising the

State. Thus they argue that the EPA could not, consistent with the Clean Air Act, authorize Indian governing bodies to control air quality standards in the Indian reservations.

This line of reasoning must be rejected. The EPA instituted PSD regulations pursuant to *Sierra Club v. Ruckelshaus*, 344 F.Supp. 253 (D.D.C.1972), *aff'd*, 4 Envir. Rep. 1815 (D.C.Cir.), *aff'd by an equally divided court sub nom. Fri v. Sierra Club*, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). One question was what procedures were appropriate for Indian tribal lands. The EPA was faced with the choice of granting the states the authority to redesignate Indian lands within their borders of exempting Indian lands from the PSD regulations, or of allowing the Indian governing bodies the same authority as the states, namely the power to redesignate their lands.

The Indian Tribes have traditionally been regarded as possessing important attributes of sovereignty, and the power of the states to regulate Indians and Indian lands has been sharply curtailed. *See Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959); *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 658 (9th Cir. 1975). As this Court stated in *Santa Rosa Band of Indians*, "we have little doubt that Congress assumed and intended that states had no power to regulate the Indian use or governance of the reservation provided, except as Congress chose to grant that power." 532 F.2d at 658. And it is well recognized that "Indian tribes possess an inherent sovereignty except where.it has been specifically taken away from them by treaty or act of Congress." *Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975).

---

\* Judge Schroeder finds this entire case unripe as a general proposition. Contrary to the dissent's assertions, however, this case became ripe at the time the redesignation, which is the only subject of this case, was approved. The crucial issue before us is the correctness of the

Agency's behavior during that process of approval. Once that process was complete, no additional events were necessary to enable this court to examine whether the agency properly exercised its authority under the law as it then existed.

Agency interpretations of federal statutes are entitled to great weight. *Brubaker v. Morton*, 500 F.2d 200 (9th Cir. 1974). "[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). Moreover, tribal sovereignty provides "a backdrop against which . . . applicable treaties and statutes must be read." *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973). Finally, the EPA regulations allowed this "self-redesignation" only for Indian reservations which had not been subjected to state jurisdiction. 40 C.F.R. § 52.21(c)(3)(v) (1975).

■ The conclusion can be drawn, therefore, that within the present context of reciprocal impact of air quality standards on land use, the states and Indian tribes occupying federal reservations stand on substantially equal footing. The effect of the regulations was to grant the Indian tribes the same degree of autonomy to determine the quality of their air as was granted to the states. We cannot find compelling indications that the EPA's interpretation of the Clean Air Act was wrong. Nor can we say that the Clean Air Act constitutes a clear expression of Congressional intent to subordinate the tribes to state decisionmaking.

Furthermore, while the 1977 Clean Air Act Amendments may not be viewed as "ratifying" the EPA action, they do indicate Congress's view that such Indian authority to redesignate their lands is appropriate. Indeed, in passing the 1977 amendments Congress was well aware that the only area that had seen substantial progress toward redesignation was an Indian Reservation. The Senate Report explicitly states:

Under existing EPA regulations, Indian tribes are authorized to designate any of their lands as class I areas. If any such designations are approved by EPA prior to the enactment of these amendments such redesignation to class I status shall not be altered by the passage of these amendments. Such a request by the Northern Cheyenne Tribe is pending and may be approved before enactment.

S.Rep.No.95–127, 95th Cong., 1st Sess. 35, *reprinted in* Senate Committee on Environment and Public Works, 3 A Legislative History of the Clean Air Act Amendments of 1977, at 1409 (1977).

*Was the Delegation of Redesignation Authority to the Indian Governing Bodies Unconstitutional*

■ Petitioners further contend that if the Clean Air Act is construed to delegate redesignation authority to the Indian governing bodies, both the Act and the regulations would to that extent be unconstitutional. Petitioners' basic argument is similar to the due process contention discussed below, namely that such a delegation gives the Indian tribes authority to affect land use by non-Indians outside the reservation area. This argument is seriously flawed. First, it hinges on the view that while Indian tribes possess attributes of sovereignty within the reservation, they are mere "private voluntary organizations" with respect to any effects outside the reservation. This seems to be an untenably grudging interpretation of the applicable Supreme Court precedents. On the specific issue of delegation of congressional legislative power, the Supreme Court has stated:

This Court has recognized limits on the authority of Congress to delegate its legislative power. *Panama Refining Co. v. Ryan*, 293 U.S. 388 [55 S.Ct. 241, 79 L.Ed. 446] (1935). Those limitations are, however, less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–322 [57 S.Ct. 216, 220, 221, 81 L.Ed. 255] (1936). Thus it is an important aspect of this case that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory, *Worcester v.*

*Georgia*, 6 Pet. 515, 557 [8 L.Ed. 483] (1832); they are a "separate people" possessing "the power of regulating their internal and social relations . . .," *United States v. Kagama*, 118 U.S. 375, 381–382 [6 S.Ct. 1109, 1112–1113, 30 L.Ed. 228] (1886); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 173 [93 S.Ct. 1257, 1262, 36 L.Ed.2d 164] (1973).

*United States v. Mazurie*, 419 U.S. 544, 556–57, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975). Petitioners agree that the Indian tribes possess "attributes of sovereignty" over their members and their territory, *id.*, but would distinguish the present case because the redesignation affects land use outside the reservation. Certainly the exercise of sovereignty by the Northern Cheyenne will have extraterritorial effect. But another element must be considered, namely the effect of the land use outside the reservation on the reservation itself. This case involves the "dumping" of pollutants from land outside the reservation onto the reservation. Just as a tribe has the authority to prevent the entrance of non-members onto the reservation, *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 410–11 (9th Cir. 1976), *cf. Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 2085–86, 65 L.Ed.2d 10 (question reserved whether state officials may enter reservation), a tribe may exercise control, in conjunction with the EPA, over the entrance of pollutants onto the reservation. We do not, however, decide whether the Indians would possess independent authority to maintain their air quality. "It is necessary only to state that the independent tribal authority is quite sufficient to protect Congress' decision to vest in tribal councils this portion of its own authority . . . ." *United States v. Mazurie*, 419 U.S. at 557, 95 S.Ct. at 717.

We note further that while the Clean Air Act permits delegation of redesignation authority to the Indian tribes, the EPA maintains certain checks on the exercise of that authority. EPA regulations require approval of a proposed reclassification by the EPA Administrator; the tribes must prepare a report discussing the social, environ-mental, and economic effects of the redesignation; a public hearing must be held on the Report; and consultation is required with states and tribes that border the reservation of the tribe proposing the redesignation.

## VI

*The Fifth Amendment Takings Claim*

Petitioners also contend that the redesignation by the Northern Cheyenne Tribe constituted a taking without due process and without just compensation in violation of the fifth amendment of the United States Constitution. These claims are not ripe for adjudication.

First, it is not yet established that strip mines are indeed subject to PSD permit procedures under the 1977 amendments. On the contrary, it appears at the very least that the EPA will have to engage in rule-making in order to subject the strip mines to those provisions, *Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979), and the regulations recently proposed by EPA would not result in requiring PSD permits for strip mines. Since any future application of the PSD regulations to strip mines would be based on agency action other than the redesignation under the pre-1977 regulations, the 30-day time limit for appealing that redesignation would not preclude the assertion of petitioners' fifth amendment claims.

Furthermore, there is no evidence in the record that even if full Class I restrictions are applied to petitioner's coal mining properties that the petitioners will be unable to engage in any profitable coal mining whatsoever. *Cf. Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The mere regulation of the use of property, even if it results in the diminution of its value and profitability does not constitute a taking within the meaning of the fifth amendment. *See generally Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Thus even assuming that strip

mines are subject to the PSD permit procedure, the takings issue is not ripe for adjudication until the effect of the redesignation on the coal mining interests of the petitioners has been determined by the EPA.

■ Petitioners' claim that the redesignation violated due process because it was for the "private" benefit of the Cheyenne Tribe is without merit. Not only is it well recognized that the Indian tribes possess attributes of sovereignty in many respects comparable to those of the states, *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), but Congress has recognized that clean air, wherever located, is in the *public* interest. To the extent that the redesignation limits polluting activities outside the area of the Northern Cheyenne reservation, a benefit is also conferred upon people living in those areas. It is noteworthy in this respect that the affected states, Wyoming and Montana, have chosen not to challenge the EPA's action. Petitioners' argument that the Indians have been allowed to regulate the use of property outside the reservation area, in violation of due process requirements, is also without merit insofar as it assumes an inherent right on their part to deposit pollutants on the property of the Indians. It was Congress and the EPA, not the Indian tribes, that decided in the first instance that the interest in clean air generally was superior to that interest represented by the polluting activity.

### VII

### *The Tenth Amendment Claim*

■ Petitioners also claim that allowing the Indians to redesignate their lands and, in so doing, to affect the use to which lands outside the reservation may be put is a violation of the tenth amendment. While the standing of petitioners to assert this claim, insofar as the tenth amendment is designed to protect the interest of the states qua states, may be seriously questioned, this claim is so patently without merit that the standing question can be left for another day. (*See* Note, *Assuming Jurisdiction Arguendo: Rationale and Limits*

*of Hypothetical Jurisdiction*, 127 U.Pa.L. Rev. 712, 733–34 (1979)).

Basically, petitioners argue that allowing redesignation by Indian tribes to have extraterritorial effects unconstitutionally limits the state's interest in planning and enforcing land use policies. This view implies that Congress is without authority to regulate directly the polluting activities of private parties. Were the court to adopt the view urged by petitioners, it is hard to see what federal activity under the commerce clause would be permitted. Here, the states have not been required to take any affirmative action, *cf. Brown v. EPA*, 521 F.2d 827 (9th Cir. 1975), *vacated and remanded*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), nor has the state's ability to regulate its own governmental affairs or allocate its own resources been affected. *Cf. National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The power to allow private citizens to engage in strip mining is hardly one of those "functions essential to separate and independent existence." 426 U.S. at 845, 96 S.Ct. at 2471. Indeed, the Supreme Court in *National League of Cities* drew an express distinction between regulations aimed at private enterprises and those aimed at states:

> It is one thing to recognize the authority of Congress to enact laws regulating individual businesses necessarily subject to the dual sovereignty of the government of the Nation and of the State in which they reside. It is quite another to uphold a similar exercise of congressional authority directed, not to private citizens, but to the States as States.

426 U.S. at 845, 96 S.Ct. at 2471.

### *Other Claims*

Petitioner Westmoreland Resources additionally appeals the EPA's denial of its petition to vacate EPA approval of the redesignation and to remand the redesignation question to the Northern Cheyenne for reconsideration. Westmoreland argues that the EPA's refusal to vacate was an abuse of

its discretion because the original approval was based upon an incorrect finding that the redesignation proposal would not affect coal mining. This is essentially the same argument we rejected above. Because the EPA's action in approving the redesignation proposal was not arbitrary and capricious, and because petitioner fails to demonstrate that the original approval was based on a clearly incorrect finding, the Administrator's denial of Westmoreland's petition cannot be found an abuse of discretion.

■ The administrative process cannot provide for the constant reopening of the record to consider new facts, *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978), and it is for the agency, not this court to determine when such reopening is appropriate, unless the failure to reconsider can be characterized an abuse of discretion. *See City of Santa Rosa v. EPA*, 534 F.2d 150, 153 (9th Cir. 1976). Moreover Westmoreland can request the Northern Cheyenne to apply for a further reclassification back to Class II standards in light of the adverse effect of the 1977 Amendments on strip mining, if there is such an effect. We therefore affirm the EPA's denial of Westmoreland's petition to vacate.

## Conclusion

For the reasons given above we hold that the EPA's action in approving the Northern Cheyenne Tribe's redesignation of its reservation from Class II to Class I air quality standards was not arbitrary or capricious. We similarly reject the numerous other arguments which Petitioners contend require us to overturn the redesignation. The Agency's action in this case is, therefore, affirmed.

SCHROEDER, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision to decide this case.

The majority opinion covers a far ranging and boulder strewn field of issues. It decides, for example, that the EPA acted properly when it dispensed with requirements of the Administrative Procedure Act,

5 U.S.C. § 553(d)(3) in order to avoid having to consider the redesignation under the 1977 Clean Air Act Amendments which were then awaiting the President's signature. That conclusion seems dubious at best.

An important reason advanced by the majority for reaching that conclusion is that the EPA has not yet promulgated regulations under the amended act which require strip mines to have PSD permits, and the redesignation thus has not had any measurable adverse impact upon the petitioners in this case, all of whom represent strip mining interests. That reason is precisely the reason I believe the Court should reach no decision in this case and dismiss on the ground that the case is not ripe.

As the Supreme Court has summarized:

Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (footnote omitted). *See also Toilet Goods Association v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) in which the Court declined to review a final agency action stating "this is not a situation in which primary conduct is affected . . . ." *Id.* at 165, 87 S.Ct. at 1525.

One leading authority has compiled a catalog of problems which courts avoid when they decide that a case is not ripe. For example, issues presented may prove irrelevant to the actual conflict which develops; sensitive constitutional issues may be better avoided; there may be dangers of intruding

into administrative programs before agency views have crystalized; premature decisions may lead to ill-advised decisions. 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3532 (1975). This case illustrates all of those problems.

This Court has recently held that a case was not ripe for decision when a potential to regulate had never been exercised, when the challenger had not been denied any privilege and had never been prosecuted, and when there was real doubt as to whether there would ever be an assertion of power. *International Society for Krishna Consciousness v. Kleppe,* 592 F.2d 529 (9th Cir. 1979). In the environmental field, the Seventh Circuit has held that a challenge to an EPA designation of "air quality maintenance areas" was not ripe for review where the challengers were "not required to do anything nor to refrain from doing anything" as a result of the designation. *Bethlehem Steel v. EPA,* 536 F.2d 156, 162 (7th Cir. 1976). The D.C. Circuit cited that case when it also rejected, on ripeness grounds, a challenge to EPA action. *Diamond Shamrock Corp. v. Costle,* 580 F.2d 670, 673 n.1 (D.C. Cir. 1978). *See also* the extensive discussion of ripeness which this Court has approved in *American Petroleum Institute v. Knecht,* 456 F.Supp. 889 (D.C.Cal.1978), *aff'd* 609 F.2d 1306 (9th Cir. 1979), stressing the importance of considering the extent of the hardship on the parties if a case is not decided. In both *Bethlehem Steel* and *Diamond,* a claim of economic harm in the nature of long range planning needs was asserted as necessitating a prompt decision. The Courts both rejected such claims as insufficient for ripeness purposes. The claim of harm here is even more attenuated.

This Court requested supplemental briefs in this case specifically directed to the question of ripeness. In those briefs, the Northern Cheyenne Tribe takes the position that the case is not ripe because there is no threatened or existing harm to strip mining interests as a result of the challenged designation. The government and the petitioners agree that strip mines are not now subject to PSD permit requirements and it is unlikely that they ever will be. The only claim of possible harm they present is a contention that fugitive emissions of the strip mines would be considered in a general assessment of Class I air quality deterioration, and that violation of those overall standards might trigger increased state controls under the State Implementation Plan. The nature of such controls or their effect on these petitioners cannot be known at this time. No such controls are asserted to be imminent. The State of Montana is not a party here, and the existence of an absent party whose presence might affect the resolution of issues is still another factor militating against deciding this case. If we further consider that the authorization of appropriations for the Clean Air Act itself will expire in 1981, 42 U.S.C. § 7404(c), thus necessitating a reconsideration of the Act in its entirety by Congress this year, the unnecessary character of today's decision becomes almost palpable. *See generally* the Clean Air Act Debate, 126 Cong.Rec. S14792 (daily ed. Nov. 21, 1980).

Petitioners have expressed fear that the provisions of the Act, requiring a petition for review to be filed within 60 days after final agency action, would leave them without the possibility of future recourse to the courts. 42 U.S.C. § 7607(b)(1) and (2). However, that section does not ring down a final curtain on review of agency action after 60 days. The section provides:

> Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise.

42 U.S.C. § 7607(b)(1).

I would construe this clause as permitting the petitioners to seek review in this Court when and if future events establish grounds to create a meaningful controversy.