**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**David SOHAPPY, Sr., et al.,
Defendants-Appellants.**

**UNITED STATES of America,
Plaintiff-Appellant,**

**v.**

**David SOHAPPY, Sr., et al.,
Defendants-Appellees.**

**Nos. 84–3032 to 84–3044, 83–3063 to
83–3065, 83–3070, 83–3072 to
83–3079, 83–3084.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1985.

Decided Sept. 4, 1985.

Stephen Schroeder, Asst. U.S. Atty., Seattle, Wash., for U.S.

Thomas W. Hiller, II, David Allen, Allen & Hansen, P.S., Seattle, Wash., for D. Sohappy, et al.

Before CHOY, Senior Circuit Judge, ANDERSON and TANG, Circuit Judges.

CHOY, Senior Circuit Judge:

This is a consolidated appeal from the convictions of thirteen Indian defendants for violating the Lacey Act prohibitions against transporting, selling, or acquiring fish taken or possessed in violation of Indian tribal law, or State law. *See* 16 U.S.C. § 3372(a)(1) & (a)(2)(A).[1]

Defendants do not deny that in the spring of 1982 they caught and sold fish outside the seasons prescribed by Indian tribal and state law and sold ceremonial fish in violation of other tribal and state regulations. However, they contend that the Lacey Act prohibitions apply only to non-Indians, in part because they claim that federal prosecution of Indians for violations of tribal fishing law violates Indian sovereignty and Indian treaty reserved fishing rights.

They also argue that the government failed to prove that their offenses occurred within Indian country, a prerequisite to a Lacey Act conviction incorporating a violation of *tribal* law. Finally, they contend that the trial judge, in summarily denying

---

1. 16 U.S.C. § 3372 provides:
 (a) Offenses other than marking offenses
 It is unlawful for any person—
 (1) to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken or possessed in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law;

 (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—
 (A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State. . . .

their numerous motions for subpoenas, improperly denied them a chance meaningfully to challenge the validity of the *state* regulations subsumed under their Lacey Act prosecutions.

Just before trial, the district judge, citing massive publicity and prejudice in Washington and Oregon against Indian treaty fishermen, granted a motion to change venue under Fed.R.Crim.Pro. 21(a) from Washington to Los Angeles. Because we affirm the defendants' convictions, we need not address the government's cross-appeal from that venue decision.

## ISSUES

1) Do the Lacey Act prohibitions apply to Indians as well as non-Indians?
 A) Do the Indian tribes have a treaty reserved right to *exclusive* jurisdiction over tribal law offenses committed by Indians?
 B) Did Congress intend that all persons, including Indians, be subject to the Lacey Act prohibitions?
2) Did the government prove that the violations of tribal law occurred in Indian country?
3) Did the government adequately demonstrate the validity of the state regulations underlying its Lacey Act prosecution and did the trial court err in rejecting the defendants' requests for subpoenas to support their challenge to the regulations?

## ANALYSIS

I. *Application of Lacey Act to Indians*

A. *No Treaty Reserved Right to Exclusive Jurisdiction*

■ Defendants' primary contention is that application of the Lacey Act to Indian defendants who violate tribal law would amount to an abrogation of the treaty reserved rights of the defendants' tribes to control and regulate Indian fishing. While Congress can override existing treaty rights through legislation, *see Menominee*

*Tribe v. United States*, 391 U.S. 404, 412–13, 88 S.Ct. 1705, 1710–11, 20 L.Ed.2d 697 (1968), the Lacey Act specifically states that "[n]othing in this chapter shall be construed as ... repealing, superseding, or modifying any right, privilege, or immunity ... reserved, or established pursuant to treaty ... pertaining to any Indian tribe." 16 U.S.C. 3378(c)(2). Thus, defendants contend that Congress must not have meant the Lacey Act prohibitions to apply to Indians.

The validity of the above argument rests on the proposition that federal enforcement of the Lacey Act penalties against Indians who violate tribal fishing law is a violation of the tribes' treaty reserved right to control Indian fishing. The crucial issue, therefore, is whether the treaties reserved to the tribes *exclusive* jurisdiction over enforcement of tribal fishing law against Indians.

In support, defendants rely to a large extent on *United States v. Jackson*, 600 F.2d 1283 (9th Cir.1979), which held that an Indian was subject to exclusive tribal jurisdiction for unauthorized hunting on reservation land. It is undisputed that the power to punish offenses committed by tribe members is part of the tribe's retained sovereignty. *United States v. Wheeler*, 435 U.S. 313, 328, 98 S.Ct. 1079, 1088, 55 L.Ed.2d 303 (1978). However, *Jackson*'s assertion of *exclusivity* was based on the doctrine initiated in *Ex parte Crow Dog*, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), in which the Supreme Court ruled that, "in the absence of an explicit Congressional directive, Indian tribes have exclusive criminal jurisdiction over offenses committed by one Indian *against another Indian*." *Jackson*, 600 F.2d at 1285 (emphasis added). The Indian defendant in *Jackson* was charged with unauthorized entrance upon Indian land for the purpose of hunting. The offense was thus one committed by an Indian against other Indians. It was reasonable to preclude federal juris-

diction over such purely intra-Indian affairs.[2]

Here, however, the Lacey Act is being applied to an offense committed by an Indian not against any particular Indian or Indians, but against tribal law and federal law (through the Lacey Act's incorporation of tribal law) designed to preserve fishing opportunities of Indians *and* non-Indians. As will be discussed in more detail later, Congress, in enacting the Lacey Act, wished to curb trafficking in illegally acquired wildlife in order to help support the web of federal, state and Indian tribal law protecting wildlife. This desire to protect wildlife reflects a concern for the general public welfare.

Furthermore, the Indians' right to take fish at all "usual and accustomed places" was not exclusive but was to be shared "in common with citizens of the Territory." Therefore, because fishing offenses are not purely intra-Indian matters but impact upon federal and state interests (involving non-Indians) as well, *Jackson* and *Crow Dog* do not support the theory that the tribes retained by treaty *exclusive* jurisdiction over Indians committing fishing offenses.

The cases cited in the defendants' brief support the right of the tribes to enforce their fishing laws (and other tribal laws) against tribal members. *See, e.g., United States v. State of Washington,* 520 F.2d 676, 686 (9th Cir.1975) ("These tribes have the power to regulate their own members

and to arrest violators ... at usual and accustomed fishing sites."), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *Settler v. Lameer,* 507 F.2d 231 (9th Cir.1974). Most importantly, however, the cases do *not* preclude *concurrent* federal jurisdiction over fishing matters.[3]

While there is thus no precedent directly supporting exclusive jurisdiction, defendants argue that allowing the federal government to charge federal felonies and misdemeanors against Indians who violate their own tribal law "effectively destroy[s] the tribal court and regulatory scheme over Indians, which is protected by the concept of tribal sovereignty as guaranteed by the treaties." It is true that the Indians have a strong interest in enforcing their tribal fishing regulations according to their own dictates and concurrent federal jurisdiction might impair independent tribal control. *See New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 338, 103 S.Ct. 2378, 2388, 76 L.Ed.2d 611 (1983).[4] However, this is consistent with the general rule that Indian sovereignty is "necessarily limited" and must not conflict with the the overriding sovereignty of the United States. *United States v. Johnson,* 637 F.2d 1224, 1230 (9th Cir.1980). Moreover, the exercise of federal jurisdiction under the Lacey Act is not particularly disruptive of tribal authority, for rather than overturning basic tribal regulations, it supports the tribal

2. In response to *Crow Dog,* Congress enacted the Major Crimes Act, *see* 18 U.S.C. § 1153, to provide for federal jurisdiction over certain offenses that Congress felt were serious enough (e.g., murder) to warrant federal intervention. The Lacey Act violations involved in this case are not among the enumerated offenses. Moreover, § 1153 is only applicable to federal enclave laws, not laws that govern regardless of the situs of the offense. *United States v. Burns,* 529 F.2d 114, 117 (9th Cir.1975).

3. While *Settler* may have somewhat confusingly suggested that tribal jurisdiction over fishing matters was exclusive when it cited *Williams v. Lee,* 358 U.S. 217, 221–22, 79 S.Ct. 269, 271–72, 3 L.Ed.2d 251 (1959) ("implicit in these treaty terms ... was the understanding that the internal affairs of the Indians remained exclusively within the jurisdiction of [the] tribal govern-

ment...."), *see Settler,* 507 F.2d at 237, any such suggestion is dictum. The only issue in *Settler* was whether the tribe had jurisdiction to enforce its fishing regulations, not whether the federal government could also regulate concurrently. Moreover, the dictum only asserts exclusive tribal jurisdiction over "internal affairs," whereas, as noted above, the regulation of fishing is not a purely intra-Indian matter.

4. The court in *Mescalero* stated that "concurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation" and would "threaten Congress' overriding objective of encouraging tribal self-government." 462 U.S. at 338, 341, 103 S.Ct. at 2388, 2390. However, *Mescalero* does not control the issue at hand because *Mescalero* condemned only concurrent *state* jurisdiction, not concurrent *federal* jurisdiction.

laws by authorizing federal penalties for violations.

Finally, as will be shown in subsection B., *infra*, Congress intended that there be federal jurisdiction over the defendants' activities and thus its simultaneous disclaimer of any intent to abrogate treaty rights can only be reconciled if there is no treaty right to exclusive jurisdiction. Before reaching the issue of congressional intent, it would be helpful to look to *United States v. Farris*, 624 F.2d 890 (9th Cir.1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 919, 66 L.Ed.2d 839 (1981), as it will tie together what has already been discussed. In *Farris*, we held that, with three exceptions, federal laws generally applicable throughout the United States apply with equal force to Indians.[5] 624 F.2d at 893. The first exception was that "Indians may well have exclusive rights of self-governance in purely intramural matters, unless Congress has removed those rights through legislation." *Id.* As noted above, however, the regulation of fishing is not a purely "intramural" matter.

Second, *Farris* noted that "it is presumed that Congress does not intend to abrogate rights guaranteed by Indian treaties when it passes general laws, unless it makes specific reference to Indians." *Id.* Indeed, the Lacey Act specifically disclaimed any intent to abrogate treaty rights. However, as explained earlier, while the Indians do have a treaty right to take fish at all usual and accustomed places in common with citizens, the Indians do *not* have any treaty reserved right to exercise *exclusive* jurisdiction over such fishing matters. Nor is there "specific language [in the treaties] ... 'purporting to exempt Indians from the laws of general applicability throughout the United States.'" *Id.* (quoting *United States v. Burns*, 529 F.2d 114, 117 (9th Cir.1975)).

Lastly, *Farris* declared that "if appellants could prove by legislative history or some other means that Congress intended [the law] not to apply to Indians ... we would give effect to that intent." *Id.* at 893–94. As will be shown in the next section, Congress did not intend any "Indian exception" to the provisions of the Lacey Act.

### B. *Congressional Intent to Include Indians*

We now decide whether Congress intended the Lacey Act prohibitions against trafficking in fish obtained in violation of Indian tribal law to apply to Indians. First, we note that the Lacey Act prohibitions refer to "any person," which would normally include Indians. *See United States v. Jackson*, 600 F.2d at 1286. Defendants contend, however, that Congress meant to include only non-Indians within the prohibition.

Congressional reports provide the following explanations for the incorporation of Indian tribal law.

> Because of the resource management responsibilities of Indian tribes, the legislation proposes that ... the provisions of the Act apply to fish and wildlife taken in violation of Indian tribal law or regulations.

S.Rep. No. 123, 97th Cong., 1st Sess. 4 (1981), U.S.Code Cong. & Admin.News 1981, pp. 1748, 1751.

> Resource management responsibilities of Indian tribes on Indian tribal lands indicate the need to expand the application of the current law to fish and wildlife taken in violation of Indian tribal laws or regulations. Any such changes would not constitute a broadening of their authority under the Act but would merely allow support for the full range of laws that protect wildlife.

---

5. The Lacey Act provisions, 16 U.S.C. §§ 3372(a)(1) and 3372(a)(2)(A), under which the defendants were prosecuted, are laws generally applicable throughout the United States. They are not federal enclave laws. While it is true that Indian tribal law, as defined in

§ 3371(c), is confined to "Indian country," the Lacey Act makes it unlawful to acquire, sell or transport illegally obtained fish, regardless of the situs of the act of acquiring, selling or transporting.

H.R.Rep. No. 276, 97th Cong., 1st Sess. 13 (1981).

The Lacey Act prohibitions extend beyond Indian tribal law by incorporating federal and state regulations as well. Indeed, the overall purpose in subjecting persons who traffic in illegally obtained fish to the stiffer Lacey Act penalties was to "allow the Federal Government to provide more adequate support for the full range of ... laws that protect wildlife." S.Rep. No. 123, 97th Cong., 1st Sess. 4 (1981), U.S. Code Cong. & Admin.News, 1981, p. 1751.

Indians who traffic in illegal wildlife harm the Lacey Act's goal of wildlife preservation just as much as non-Indian traffickers. The stiff Lacey Act penalties are necessary to "deter[ ] those violators who can net $100,000 per year by trafficking illegally caught salmon." H.R.Rep. No. 276, 97th Cong., 1st Sess. 11 (1981). To exempt Indians from these penalties would impede attainment of Congress' goal.

Defendants argue that Congress' intent in incorporating Indian tribal law was merely to provide a mechanism for enforcement of tribal law against non-Indians, because it is generally recognized that "Indian tribes do not have inherent jurisdiction to try and to punish non-Indians." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 212, 98 S.Ct. 1011, 1022, 55 L.Ed.2d 209 (1978). Nothing in the legislative history, however, directly supports this theory.

Moreover, even if there were evidence of such a purpose, that would not necessarily mean that Congress wished to exempt Indians from the Act's prohibitions. After all, the Lacey Act prescribed stiffer penalties which would not otherwise be imposed upon Indian offenders were the tribes to be the sole enforcers of their regulations against fellow Indians. Furthermore, the Lacey Act did not merely incorporate tribal law, but created new offenses by prohibiting *trafficking* in fish obtained in violation of tribal law.

■ In sum, even if Congress sought to extend tribal law to non-Indians, it could also have desired that the Lacey Act prohibitions and penalties apply to Indians as well. Given Congress' goal of preserving wildlife, it is only reasonable to assume that Congress intended the Lacey Act to encompass everyone, including Indians.

Defendants rely upon *United States v. Jackson*, 600 F.2d 1283 (9th Cir.1979), which held that Congress intended the term "whoever," in a federal statute prohibiting going upon Indian land without lawful authority for the purpose of hunting, to encompass only non-Indians. The court noted that the legislative history indicated that the statute was enacted to provide a means of enforcing tribal trespass law against non-Indians who would otherwise be exempt under the *Oliphant* doctrine. However, there is no comparable legislative history behind the Lacey Act. In *Jackson*, we noted Congress' concern for the fact that Indian property owners could not keep non-Indian trespassers off their lands since tribal law was unenforceable against non-Indians. 600 F.2d at 1287. There was no need to make the statute applicable to Indian offenders. The Lacey Act, on the contrary, should apply to Indian offenders, too, in order to fully effectuate Congress' goal of protecting wildlife.

Furthermore, the defendants' asserted congressional rationale does not hold up when one remembers that the Lacey Act makes it unlawful for "any person" to traffic not only in fish obtained in violation of *tribal* law, but also in fish obtained in violation of *federal* and *state* law as well. *See* 16 U.S.C. § 3372(a). Consequently, if defendants are correct in their view that "any person" refers only to non-Indians, then Indians would also be exempt from the prohibitions against trafficking in fish obtained in violation of *federal* or *state* law. There is no justification for such an exemption, one which would severely hinder Congress' efforts at eliminating the illegal wildlife trade.

Finally, the claim that Congress was merely extending tribal law to cover non-Indians becomes even less plausible when one notes that the incorporation of tribal

law was done in the same breath as the incorporation of federal and state regulations, yet there was no need to extend federal and state regulations to non-Indians as non-Indians were always subject to those laws. For all of the above reasons, we conclude that Congress intended the Lacey Act to apply to Indians as well as non-Indians.

## II. Occurrence of the Violations Within Indian Country

 The Lacey Act makes clear that with regard to fish obtained in violation of tribal law, only those tribal law offenses occurring within Indian country are subsumed under 16 U.S.C. § 3372. See 16 U.S.C. § 3371(c). Defendants argue that the government failed to prove that the tribal law violations occurred in Indian country. We reject that contention.

18 U.S.C. § 1151 defines Indian country to include, in relevant part, "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government." The defendants effectively concede that the violations occurred in Cooks Landing, Washington or in Celilo, Oregon, but they claim that these locations are not within Indian reservations.

The trial judge, apparently satisfied that those two sites were Indian country,[6] instructed the jury that they need only find that the violations occurred in Cooks Landing or Celilo. Because the defendants did not object to this instruction at trial, this court will only review the defendants' contention if there was plain error.[7] United States v. Wilson, 690 F.2d 1267, 1274 (9th Cir.1982), cert. denied, —— U.S. ——, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983).

The term "Indian reservation" is not defined by statute. However, the Supreme Court in United States v. John, 437 U.S. 634, 649, 98 S.Ct. 2541, 2549, 57 L.Ed.2d 489 (1978), suggested that land "declared by Congress to be held in trust by the Federal Government for the benefit of the ... Indians ... [is a] 'reservation,' at least for the purposes of federal criminal jurisdiction [under 18 U.S.C. § 1153]." Similarly, the Supreme Court in United States v. Pelican, 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914), stated the principal test as whether the land "had been validly set apart for the use of the Indians as such, under the superintendence of the Government." Accord Cheyenne-Arapaho Tribes v. State of Oklahoma, 618 F.2d 665, 667–68 (10th Cir.1980) (holding that lands held in trust by the United States for the Tribes are Indian country within the meaning of § 1151(a)).

The government introduced at trial certified title documents from the Bureau of Indian Affairs indicating that titles to Celilo and Cooks Landing are held by the United States government for the benefit of the Columbia River treaty tribes, pursuant to specified acts of Congress. For example, one tract of Celilo was purchased by the United States government "in trust ... for the use of the Yakima Indian Tribes ... the Confederated Tribes of the Warm Springs Reservation, and other Columbia River Indians affiliated with the aforementioned tribes and entitled to enjoy fishing rights ... at or in the vicinity of Celilo Falls." 61 Stat. 466 (1947) (emphasis added). The other Celilo tract was transferred from the Secretary of War to the Secretary of Interior "for the use and benefit of certain Indians now using and occupying

---

**6.** The issue of what constitutes Indian country is properly a matter for the judge and not the jury. See United States v. Levesque, 681 F.2d 75, 78 (1st Cir.), cert. denied, 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982).

**7.** Defendants are mistaken in their assertion that the claim is reviewable without restriction because "lack of subject matter jurisdiction is an issue which may be raised at any time." The question of whether the tribal law violations occurred within Indian country is not a jurisdic-

tional matter but relates merely to an element of a § 3372(a)(1) offense. Defendant's citation of United States v. Heath, 509 F.2d 16, 18–19 (9th Cir.1974), is irrelevant because the statutes involved in Heath were 18 U.S.C. §§ 1152 & 1153, which are special statutes conferring jurisdiction over certain offenses committed in Indian country. Section 3372, on the contrary, is not a jurisdictional provision. It defines the offense, itself.

823

the land as a fishing camp site." 45 Stat. 1158 (1929) (emphasis added).

The Cooks Landing site was acquired by the Secretary of War "to replace Indian fishing grounds submerged or destroyed as a result of the construction of Bonneville Dam" and transferred to the Secretary of Interior *"for the use and benefit of* the Indians." 59 Stat. 22 (1945) (emphasis added). Cooks Landing is subject to federal government regulation under 25 C.F.R. Part 248. It is evident, therefore, that the Celilo and Cooks Landing sites amount to "reservation land" under the tests laid out in *John* and *Pelican.*

In *United States v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938), the Supreme Court found Reno Colony to be Indian country.

The Reno Colony has been validly set apart for the use of the Indians. It is under the superintendence of the Government. The Government retains title to the lands which it permits the Indians to occupy. The Government has authority to enact regulations and protective laws respecting this territory....

[I]t is not reasonably possible to draw any distinction between this Indian "colony" and "Indian country."

302 U.S. at 539, 58 S.Ct. at 288. As discussed above, Celilo and Cooks Landing are similarly owned by the United States and held for the benefit and use of the various Columbia River treaty tribes. In sum, the government adequately demonstrated that Celilo and Cooks Landing are within Indian country. There was no error, let alone plain error, in the jury instruction.

III. *Validity of the State Regulations*

■ Defendants argue that the trial judge improperly denied them the chance to challenge the validity of the state laws underlying their Lacey Act convictions. The Indian treaty right to take fish at all usual and accustomed places in common with citizens of the Territory may not be qualified by the States. *Puyallup Tribe v. Dep't of Game (Puyallup I),* 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689

(1968). However, the *Puyallup* Court also ruled that "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." *Id.* The "appropriate standards" requirement has been interpreted to mean that "the State must demonstrate that its regulation is a reasonable and necessary conservation measure *and* that its application to the Indians is necessary in the interest of conservation." *Antoine v. Washington,* 420 U.S. 194, 207, 95 S.Ct. 944, 952, 43 L.Ed.2d 129 (1975) (citations omitted).

■ Thus, a *State* prosecuting an Indian treaty fisherman for violating a state fishing regulation must establish that the regulation is reasonable and necessary for conservation purposes. *See, e.g., State v. Reed,* 92 Wash.2d 271, 275, 595 P.2d 916, 919, *cert. denied,* 444 U.S. 930, 100 S.Ct. 272, 62 L.Ed.2d 187 (1979). The case at bar, however, involves a *federal* prosecution under the Lacey Act for trafficking in fish obtained in violation of state law.

Because the *Puyallup/Antoine* requirements were considered necessary to preserve Indian treaty rights, state laws that failed to meet those requirements were invalid. Therefore, because Congress in enacting the Lacey Act disclaimed any intent to abrogate Indian treaty rights, Congress must have intended its prohibition against trafficking in fish obtained in violation of state law to apply only to *valid* state regulations.

Must the federal government in a Lacey Act prosecution establish the validity of the underlying state regulations (just as a state must, see *Reed, supra* ), or must the defendant prove the invalidity of the regulations? Given that states must bear the burden in state prosecutions, we do not believe that Congress intended to relieve the federal government, in a Lacey Act prosecution incorporating a state law violation, of the burden of establishing the state law's validity. To shift the burden to the

defendant Indians would make it more difficult for the Indians to protect themselves against improper state encroachments on their treaty rights, an outcome that, in light of Congress' explicit disclaimer, could not have been intended.

■ Therefore, we conclude that the federal government must establish the validity of the state regulations underlying a Lacey Act prosecution. The government makes much of the fact that the system of state regulations being challenged was under the continuing jurisdiction and supervision of the District Court for the District of Oregon in the case of *United States v. Oregon*, Civ. No. 68–513. That court had issued a decree in 1977 adopting "A Plan for Managing Fisheries on Stocks Originating from the Columbia River and its Tributaries Above Bonneville Dam" ("the Plan"), a plan drawn up and consented to by both the states and the tribes.

Because of this continuing court supervision under the Plan over state and tribal regulation of fishing matters around the Columbia River, the government contends that it no longer has to bear the burden of proving the validity of each individual state regulation. The government seems to be claiming that all state regulations enacted pursuant to the Plan are implicitly validated by the Oregon court if the court is silent and the tribes fail to object. The government even suggests that the defendants are collaterally estopped from challenging the regulations.

The government's argument is flawed, however, because the Plan adopted by the Oregon court did not specifically approve or adopt any particular state regulations, let alone those regulations involved in this case, but rather merely laid out a very general framework governing state and tribal rights and regulations regarding fishing matters. Indeed, the Plan states that "[r]egulations affecting treaty users *which are enacted in conformity with this*

*comprehensive plan* shall be considered as complying with the court's decrees enunciated in *U.S. v. Oregon.*" (emphasis added). Naturally, the Plan did not deem all state regulations valid but only those enacted in conformity with the Plan. The government even admits that the tribes have successfully challenged various state regulations that did not conform.

Therefore, we cannot accept the government's contention that the District Court of Oregon's adoption and supervision of the Plan validates the particular state regulations the defendants seek to challenge. Consequently, the government must still bear the burden of establishing the validity of the state regulations involved in this case.[8]

The state regulations encompassed in the government's Lacey Act prosecution, in general, prohibit fishing for commercial purposes outside of certain seasons set aside for commercial fishing, and prohibit the commercial sale of fish taken for subsistence or ceremonial purposes. The states set the 1982 commercial fishing season via the Columbia River Compact, an interstate agency controlling commercial fishing on the Columbia River. The Compact received recommendations from the Washington and Oregon fisheries departments that explained that the seriously depressed upriver spring chinook run required that there be no spring 1982 commercial fishing season.

It is especially significant that the Columbia River Inter-Tribal Fish Commission, representing the treaty tribes, agreed with that recommendation stating that it "recognizes that the 1982 upriver spring chinook run will be a record or near-record low. [Thus,] no commercial harvest of these fish can be justified." The Yakima and Warm Springs tribes concurred. The Columbia River Compact accepted the recommendations and closed the fishery for the spring of 1982 saying that the closure was "rea-

---

**8.** There is no basis for the government's contention that the defendants cannot litigate this issue because it was "under the direct cognizance of a sister court." The validity of the particular state regulations incorporated in the government's Lacey Act prosecution was never raised before the Oregon court.

sonable and necessary for conservation" and that there was no "less restrictive alternative." We conclude that the government has adequately established the validity of the 1982 spring season ban adopted by the Compact.

Although the government presented no specific evidence to demonstrate the necessity of the state bans on the commercial sale of ceremonial or subsistence fish, comparable Indian tribal laws prohibit the same activity. The forbidden sales would thus be prosecutable under the Lacey Act regardless of the validity of the state regulations.

Both pre-trial and at trial, the defendants attempted to subpoena witnesses who they claimed would testify in support of their contention that the state regulations were not valid because they were not reasonable or necessary to conservation and were not validly promulgated. The trial judge summarily denied the motions for the issuance of the subpoenas simply citing *United States v. Sims*, 637 F.2d 625 (9th Cir.1980). The only plausible basis for the denial is that the defendants may have failed to make a satisfactory showing, under **Fed.R. Crim.P.** 17(b), that the witnesses were necessary to an adequate defense.

The Ninth Circuit has interpreted this requirement to mean that:

'[i]f the accused avers facts which, if true, would be relevant to any issue in the case, the requests for subpoenas must be granted, unless the averments are inherently incredible on their face, or unless the Government shows, either by introducing evidence or from matters already of record, that the averments are untrue or that the request is otherwise frivolous.'

*Sims*, 637 F.2d at 627 (quoting *Greenwell v. United States*, 317 F.2d 108, 110 (D.C. Cir.1963)). The defendants failed to meet this standard.

In their affidavits supporting their motions, the defendants made only very general statements to the effect that the witnesses had information relevant to the issue of the validity of the state regulations. The affidavits did not allege any specific facts regarding fishing matters that would buttress the defendants' claim that the regulations were unnecessary for conservation. There were no statements regarding the specific content of the expected testimony of the witnesses. While the defendants did make clear that they expected the witnesses to buttress their claim, the lack of any specificity in their allegations suggests that they may merely have been fishing for unknown evidence. The trial judge acted within his discretion in denying the motions.

In sum, the government adequately established the validity of the 1982 spring season ban on commercial fishing. Although given a fair opportunity, the defendants were unable to generate evidence to refute the view of the Inter-Tribal Fish Commission and the states' fisheries departments that the ban was reasonable and necessary to conservation.

The defendants' convictions are AFFIRMED.