151 F.3d 1205
 47 ERC 1136, 28 Envtl. L. Rep. 21,515,
98 Cal. Daily Op. Serv. 6240,
99 Cal. Daily Op. Serv. 1396,
98 Daily Journal D.A.R. 8643
 ADMINISTRATOR, STATE OF ARIZONA, and Jane Hull, Governor, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
Yavapai-Apache Tribe, Respondents.
ARIZONA CHAMBER OF COMMERCE; and the Town of Clarkdale, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
Yavapai-Apache Tribe, Respondents.
 Nos. 96-71083, 97-70012.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 12, 1998.
Decided Aug. 10, 1998.
 
 Matthew P. Millea, Yvonne R. Hunter, Phoenix, Arizona, for petitioner State of Arizona; Laura W. Janzik, J. Stanton Curry, David J. Armstrong, Randy E. Brogdon, Gallagher & Kennedy, Phoenix, Arizona, for petitioner Arizona Chamber of Commerce.
 Ann C. Juliano, Joshua M. Levin, United States Department of Justice, M. Lea Anderson and James J. Havard, Office of General Counsel, Leslie Guinan, Region IX, Office of Regional Counsel, United States Department of Justice, Washington, DC, for respondent EPA; David J. Ouimette, Mariscal, Weeks, McIntyre & Friedlander, Phoenix, Arizona, for respondent Yavapai-Apache Tribe.
 John S. Greene, Wisconsin Department of Justice, Madison, Wisconsin, for amici curiae States of Wisconsin, California, Michigan, Montana, South Dakota and Utah; Brian J. Renaud, Howard & Howard, Bloomfield Hills, Michigan, for amici curiae The American Forest and Paper Association, The Wisconsin Paper Council, et al.
 Petitions for Review of the Final Agency Action of the Environmental Protection Agency. 61 Fed.Reg. 56,461 (Nov. 1, 1996), 61 Fed.Reg. 56,450 (Nov. 1, 1996).
 Before: GOODWIN, PREGERSON, and FERGUSON, Circuit Judges.
 Opinion by Judge GOODWIN; Partial Concurrence and Partial Dissent by Judge FERGUSON.
 GOODWIN, Circuit Judge:
 
 
 1
 The Petitioners seek to overturn the Environmental Protection Agency's ("EPA") approval of the request by the Yavapai-Apache Tribal Council ("the Tribe") to redesignate its land as a non-Federal "Class I" area under the Clean Air Act's ("CAA") program for Prevention of Significant Deterioration ("PSD"). The "Class I" redesignation allows the Tribe to lower the allowable increases in ambient concentrations of particulate matter, sulphur dioxide, and nitrogen dioxide on the Tribe's land. EPA approved the redesignation after determining that the lands the Tribe sought to redesignate were Indian reservations within the meaning of the Act and that the Tribe fully met the procedural requirements detailed in 42 U.S.C. § 7474(b).
 
 
 2
 The Petitioners contend that EPA abused its discretion in approving the redesignation because four of the five parcels redesignated are not actually Indian reservations as the term is used in 42 U.S.C. § 7474(c). The Petitioners further assert that EPA abused its discretion in approving the redesignation because the Tribe failed to meet the procedural requirements outlined in § 7474(b). Specifically, the Petitioners complain that the Tribe's analysis of the health, environmental, economic, social and energy effects of the proposed redesignation was inadequate. We have jurisdiction to review this case under 42 U.S.C. § 7607(b). We affirm in part and we reverse and remand in part.I.
 
 
 3
 In 1977, Congress amended the Clean Air Act ("CAA") to provide for a Prevention of Significant Deterioration ("PSD") program which would apply to "clean areas"-those areas which meet the national ambient air quality standards (attainment areas) or for which there is insufficient information to reach a conclusion about their status (unclassifiable areas). 42 U.S.C. § 7471. Congress added the PSD program to the CAA in order "to preserve, protect and enhance air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value." 42 U.S.C. § 7470(2).
 
 
 4
 Pursuant to the PSD program, all clean areas are classified as "Class I," "Class II," or "Class III." 42 U.S.C. § 7472. An area's classification determines the maximum allowable increments of air deterioration allowed. 42 U.S.C. § 7473. Class I areas have the smallest allowable increments and thus permit the least amount of deterioration of air quality. Id. By contrast, Class III areas have the largest allowable increments and permit the greatest deterioration of air quality, allowing deterioration up to the national ambient air quality standards. Id.
 
 
 5
 In enacting the PSD program, Congress designated all international parks, wilderness areas, national memorial parks, and national parks as Class I. 42 U.S.C. § 7472(a). Congress also affirmed the Class I status of any areas designated as Class I by the EPA under its own PSD regulations before Congress enacted its PSD program. Id. All other clean areas were initially designated as Class II, with Congress expressly reserving the authority to the States and the Indian governing bodies to redesignate lands within their jurisdiction to Class I or Class III status, if needed, to accommodate the social, economic, and environmental needs and desires of the local populations. 42 U.S.C. §§ 7472(b) and 7474.
 
 
 6
 The process of redesignation is spelled out in the PSD provisions. Because a redesignation by an Indian governing body is at stake in this case, we will focus on the process of redesignation only for Indian governing bodies. The PSD provisions provide that an Indian governing body may redesignate "[l]ands within the exterior boundaries of reservations of federally recognized Indian Tribes." 42 U.S.C. § 7474(c). To achieve redesignation the Indian governing body must meet the following procedural requirements:
 
 
 7
 (1) Announce its intention to the appropriate EPA regional office.
 
 
 8
 (2) Hold at least one public hearing in accordance with procedures outlined in 40 C.F.R. § 51.102.
 
 
 9
 (3) Notify other States, Indian Governing Bodies, and Federal Land Managers whose lands may be affected by the redesignation at least 30 days prior to the public hearing.
 
 
 10
 (4) Prepare a report discussing the reasons for the proposed redesignation including a satisfactory description and analysis of the health, environmental, economic, social, and energy effects of the proposed redesignation.
 
 
 11
 (5) Make the report available for public inspection at least thirty days prior to the public hearing, and notify the public of the availability of such report.
 
 
 12
 (6) Give written notice to the Federal Land Manager where a proposed redesignation would include Federal Lands and afford the Federal Land Manager an adequate opportunity to submit written comments and recommendations.
 
 
 13
 (7) Consult with the State or States in which the reservation is located and the States which border the reservation.
 
 
 14
 (8) Submit the proposal to redesignate to the EPA Administrator through the appropriate regional office.
 
 
 15
 See 42 U.S.C. § 7474(b) and 40 C.F.R. § 52.21.
 
 
 16
 Once these procedural requirements are met, EPA must approve the request for redesignation. The PSD provisions of the CAA provide:
 
 
 17
 The Administrator may disapprove the redesignation of any area only if he finds, after notice and an opportunity for public hearing, that such redesignation does not meet the procedural requirements of this section ...
 
 
 18
 42 U.S.C. § 7474(b)(2).
 
 II.
 
 19
 On December 7, 1993, the Yavapai-Apache Tribal Council (the "Tribe") submitted a request to EPA to redesignate five noncontiguous parcels of land from Class II to Class I status. The five parcels of land were as follows: the Clarkdale parcel, consisting of 58.50 acres; the Middle Verde parcel, consisting of 458 acres; the Lower Verde parcel, consisting of 55 acres; the Montezuma Interchange parcel, consisting of 74.84 acres; and the Rimrock parcel, consisting of 3.7594 acres. The Tribe asserted that these five parcels, totaling approximately 632 acres, constituted the whole of its reservation.
 
 
 20
 In support of its request for Redesignation, the Tribe prepared an Air Quality Redesignation Plan (the "Plan"). In this Plan, the Tribe discussed its reasons for requesting reclassification and addressed some of the possible health, environmental, economic, social, and energy effects of the proposed redesignation both on and off the reservation. Specifically, the Tribe based its request upon its desire to maintain high air quality standards for its members and to ensure the protection of its resources for future generations. The Tribe recounted the history of the reservation and the special religious and cultural value the reservation holds for its members. The Tribe asserted that increased air pollution from industrial activity could cause serious health problems for members living on the reservation. The Tribe also stated that it was particularly concerned with the Phoenix Cement Plant's ("Phoenix Cement") plan to incinerate used tires as supplemental fuel. The Tribe admitted that redesignation to Class I status could force some industries, to install pollution controls and, thus, could increase their costs, but the Tribe failed to detail what specific effect, if any, redesignation could have on local sources already in existence, including Phoenix Cement.
 
 
 21
 After submitting the Plan, the Tribe conducted a public hearing as required under the PSD provisions and reviewed submitted written testimony regarding the effects of the proposed redesignation. The Tribe gave adequate advance notice to the appropriate states, Indian governing bodies, and Federal land managers. Both those in favor of redesignation and those opposed to redesignation participated in the hearing.
 
 
 22
 On April 18, 1995, after reviewing the Tribe's redesignation request and preliminarily finding that the Tribe met the procedural requirements for redesignation, EPA published a notice of proposed rulemaking to approve the redesignation and announced a 30-day comment period. In response to a request from the Town of Clarkdale, EPA then held a public hearing in Clarkdale, Arizona on June 22, 1994. Following this public hearing, EPA extended the period for public comment to August 22, 1994.
 
 
 23
 On August 22, 1994, the Arizona Governor requested that EPA initiate dispute resolution proceedings concerning the redesignation pursuant to 42 U.S.C. § 7474(e). That section provides that if a dispute arises between a Governing Indian Body and an affected State regarding a redesignation, either party may request dispute resolution proceedings to be presided over by the Administrator of the EPA (the "Administrator"). 42 U.S.C. § 7474(e). If requested by either party, the Administrator must make a recommendation to resolve the dispute. Id. If the parties involved do not reach agreement, the Administrator must resolve the dispute. Id. In resolving the dispute, the Administrator must consider the extent to which the lands involved are of sufficient size to allow effective air quality management or have air quality related values. Id. The Administrator's resolution of the dispute becomes part of the applicable plan and is enforceable as part of such plan. Id.
 
 
 24
 The Governor initially requested dispute resolution proceedings in order to address certain outstanding concerns of stakeholders and to ensure that the effects of the proposed redesignation were better understood. The Governor later informed EPA that he initiated dispute resolution proceedings to raise the issue of whether the Tribe's reservation was of sufficient size to allow effective air quality management or to have air quality related values.
 
 
 25
 Between October of 1994 and January of 1995, EPA worked with Arizona and the Tribe to resolve their dispute. EPA conducted a formal dispute resolution hearing between Arizona and the Tribe in January of 1995, during which the parties examined the concerns raised by the Governor. The Chamber did not participate in these proceedings. Ultimately, EPA concluded that Arizona's concerns did not constitute a basis for disapproving the Tribe's redesignation request. EPA found that the reservation lands were not too small to allow effective air quality management or to have air quality related values. EPA further found that the Tribe had complied with the procedural requirements for redesignation. EPA decided to approve the request for redesignation because the Tribe had met the procedural requirements. EPA published its ruling in the Federal Register, 61 Fed.Reg. 56, 461 (November 1, 1996). In a separate notice in the Federal Register, on the same day, EPA published its ruling resolving the dispute resolution proceedings in favor of the Tribe.
 
 
 26
 On December 2, 1996, the State of Arizona in conjunction with the Governor of Arizona ("Arizona") filed a petition with this court seeking review of the EPA ruling approving the redesignation. In its petition for review, Arizona argues that EPA erred in concluding that four of the five parcels were reservations within the meaning of the Act and that EPA consequently abused its discretion in approving the redesignation for these four parcels. Arizona also argues that the Tribe failed to meet the PSD procedural requirements inasmuch as it did not submit a satisfactory analysis of the impacts of redesignation. Specifically, Arizona complains that the Tribe improperly failed to analyze the effects of redesignation on the Phoenix Cement Plant, located near the Clarkdale parcel.
 
 
 27
 Arizona did not formally appeal from the EPA ruling resolving the dispute resolution proceedings in favor of the Tribe. Arizona nevertheless asserts in its reply brief that EPA abused its discretion by promulgating the redesignation decision as part of a new federal implementation plan and by deferring to the Tribe's position in resolving the dispute between Arizona and the Tribe.
 
 
 28
 On December 23, 1996, the Arizona Chamber of Commerce (the "Chamber") filed a petition with this court seeking review of both the ruling approving the redesignation for all five parcels and the ruling resolving the dispute resolution proceedings in favor of the Tribe. The Chamber argues that none of the five parcels are reservation lands and that the Tribe failed to meet the PSD procedural requirements by failing to submit a satisfactory analysis of the impacts of redesignation. The Chamber also asserts that EPA improperly deferred to the Tribe's position in resolving the dispute between Arizona and the Tribe.
 
 
 29
 Upon reviewing the record, we find that the Chamber did not participate in either the EPA redesignation proceedings or the dispute resolution proceedings. Accordingly, we hold the Chamber lacks standing to petition this court for review of either of the EPA rulings. We proceed to address only those arguments raised by Arizona on appeal.
 
 III.
 
 30
 First, Arizona argues that EPA abused its discretion in approving the Tribe's "Class I" redesignation request for all five parcels. In approving the Tribe's redesignation request, EPA relied on 42 U.S.C. § 7474(c) which states that "[l]and within the exterior boundaries of reservations of federally-recognized Indian tribes may be redesignated only by the appropriate Indian governing body." 42 U.S.C. § 7474(c). Arizona stipulated at oral argument that the Middle Verde parcel, consisting of 458 acres, was a reservation as the term is used in 42 U.S.C. § 7474(c). Accordingly, EPA did not abuse its discretion in reclassifying this parcel. With regard to the other four parcels, which amount to approximately 191.3 acres in size, there is insufficient evidence in the record to support a finding that these parcels have been declared to be reservations by Act of Congress or that these parcels have been added to the Middle Verde reservation by proclamation of the Secretary of the Interior pursuant to the Indian Reorganization Act. We need not, however, definitively decide whether these four parcels are reservation lands for purposes of the Clean Air Act because our approval of the "Class I" redesignation for the sizable Middle Verde parcel effectively achieves "Class I" redesignation for the surrounding four parcels.
 
 IV.
 
 31
 Second, Arizona argues that EPA abused its discretion in determining that the Tribe adequately described and analyzed the effects of its proposed redesignation and that the Tribe therefore met the procedural requirements outlined in 42 U.S.C. § 7474(b). Congress has established a narrow role for EPA in reviewing State or Tribal requests for redesignation. Under EPA's pre-1977 regulations, EPA could disapprove redesignation requests wherever it found a state to have "arbitrarily and capriciously disregarded" anticipated growth in the area, the social, environmental, and economic impact of redesignation on surrounding areas, or any impacts on regional or national interests. See 40 C.F.R. § 52.21(c)(3)(vi)(a)(1975); § 52.21(c)(3)(ii)(d); 30 Fed.Reg. 42510, 42515. In passing the 1977 Amendments, however, Congress limited EPA's authority to disapprove redesignation requests to a procedural level. The pertinent PSD provision provides:
 
 
 32
 The Administrator may disapprove the redesignation of any area only if he finds, after notice and an opportunity for public hearing, that such redesignation does not meet the procedural requirements of this section ...
 
 42 U.S.C. § 7474(b)(2)
 
 33
 The House Report accompanying the 1977 Amendments explains that in passing the PSD program, Congress intended to delete EPA's PSD regulations and substitute a system which would give a greater role to local governments and would restrict the role of the Federal Government by eliminating the authority which EPA had to override a local government's classification of any area on the ground that the local government improperly weighed energy, environment, and other factors. H.R.Rep. No. 95-294, at 7-8.
 
 
 34
 In light of EPA's clearly restricted scope of review, we hold that EPA did not abuse its discretion in approving the Tribe's redesignation request to the extent the request covered bona fide reservation land. EPA concluded that the statutory requirement of a "satisfactory description and analysis" is a relatively low threshold. We must defer to EPA's statutory interpretation of this PSD requirement because it is a reasonable interpretation. See Chevron, 467 U.S. at 843-44, 104 S.Ct. 2778. Significantly, the statute does not assign any weight to these individual effects and does not suggest that one effect should be given priority over another.[1]
 
 
 35
 In reviewing the Tribe's Plan for redesignation, it is readily apparent that the Tribe did describe and analyze the possible health, environmental, economic, social, and energy effects of redesignation as required by the PSD provisions. Arizona does not deny that the Tribe considered these effects. Arizona nevertheless complains that the Tribe's analysis and description of these effects were inadequate.
 
 
 36
 Unfortunately, this court has already determined in Nance v. EPA, 645 F.2d 701 (9th Cir.1981), that such a complaint will not suffice to thwart a redesignation request. In Nance, the court rejected a Tribe's argument that the Northern Cheyenne Tribe's analysis of the effects of its proposed redesignation was inadequate. The court found that it was sufficient that the Northern Cheyenne Tribe addressed the statutorily prescribed effects of redesignation in its Plan. The court concluded that "the Clean Air Act contains a strong presumption in favor of the maintenance of clean air, and the nature of a decision which simply requires that the air quality be maintained at a certain level prevents any exact prediction of its consequences." Id. at 712.
 
 
 37
 In view of Nance and the fact that Congress does not want EPA re-weighing the effects of a proposed redesignation or second-guessing a Tribe's decision to redesignate its reservation lands, it cannot be said that EPA abused its discretion in concluding that the Tribe was not required, as a prerequisite to redesignation, to go further in its Plan by (1) explicitly balancing the different effects of redesignation; (2) identifying air quality related values; (3) evaluating the extent to which Class I status might discourage particular industrial development and expansion; or (4) pointing to specific off-site sources which might be impacted by the redesignation, including the Phoenix Cement Plant.
 
 
 38
 The EPA properly concluded that such analysis would be "speculative" and would depend on the nature of unknown future activities taking place on or near the Tribe's land. This is especially true in the case of the Phoenix Cement Plant which is in the process of requesting, but has not yet been granted, a permit to change its current operations in order to use recycled tires for twenty-five percent of its fuel.
 
 
 39
 Because the Tribe in this case openly considered all the factors enumerated in the PSD provisions in its Plan, we affirm EPA's ruling that the Tribe satisfied its procedural requirements under the Act. The Tribe's "choice in favor of the certainty of clean air" was a choice "supported by the preferences embodied in the Clean Air Act." See Nance, 645 F.2d at 712.
 
 V.
 
 40
 Third, Arizona argues that EPA abused its discretion in promulgating the Tribe's redesignation as part of a federal implementation plan. When approving a redesignation request, EPA must promulgate the redesignation as part of an "applicable plan." 42 U.S.C. § 7474(e). The redesignation then becomes enforceable as part of that plan. Id. The problem in this case is that there was no "applicable plan" to which the redesignation ruling could be properly attached.
 
 
 41
 The CAA provisions do not define "applicable plan." In the 1990 Amendments to the CAA, however, Congress did include a definition of "applicable implementation plan." See 42 U.S.C. § 7602(q). Under this definition there are three types of plans:
 
 
 42
 (1) State Implementation Plans ("SIPs") which are issued under 42 U.S.C. § 7410;
 
 
 43
 (2) Federal Implementation Plans ("FIPs") which may be issued in response to an uncorrected deficiency in a SIP under 42 U.S.C. § 7410(c); and
 
 
 44
 (3) Tribal Implementation plans ("TIPs") which are issued under section 42 U.S.C. § 7601(d).
 
 
 45
 42 U.S.C. § 7602(q).
 
 
 46
 In approving the redesignation, EPA properly acknowledged that a State Implementation Plan ("SIP") is not an "applicable plan" for a sovereign tribe. However, in promulgating the redesignation as part of a newly created FIP, EPA ignored the CAA 1990 Amendments which dictate that the applicable plan for an Indian Tribe is a Tribe Implementation Plan ("TIP"), not an FIP. 42 U.S.C. § 7601. EPA likely chose to promulgate the redesignation as part of an FIP because, since 1990, EPA has failed to act as directed by Congress to promulgate both regulations establishing the elements of a tribal implementation plan and the procedures for approving and disapproving tribal implementation plans. Nevertheless, EPA's failure to act does not render the use of an FIP proper. FIPs are specifically meant to fill in the gaps where a State has failed to submit an SIP or where the State's SIP does not satisfy minimum criteria under the CAA. See 42 U.S.C. § 7410(c)(1). In this case, the Tribe has never been given the chance to submit its own TIP.
 
 
 47
 The case EPA relied on to convince this court that it may use an FIP instead of a TIP to effectuate nationwide coverage of the CAA is not on point. In Phillips Petroleum Co. v. EPA, 803 F.2d 545, 555-56 (10th Cir.1986), the Tenth Circuit was faced with the Safe Drinking Water Act, an environmental statute that did not directly address Indians or Indian lands. The Tenth Circuit ultimately determined that the Safe Drinking Water Act was applicable to Indian lands because Congress intended that Indians should enjoy the benefits of clean drinking water as should all Americans. In this case, by contrast, Congress has not failed to directly address Indian rights and Indian lands under the PSD program to the CAA. In passing the 1990 Amendments, Congress made it clear that TIPs are the applicable plans for Indian tribes.
 
 
 48
 Accordingly, we hold that EPA abused its discretion in promulgating the Tribe's redesignation as part of a newly created FIP.[2] We remand this case to EPA so it may re-promulgate its redesignation ruling in accordance with the statutory requirements.
 
 VI.
 
 49
 Finally, Arizona argues that EPA abused its discretion in conducting the dispute resolution proceedings between Arizona and the Tribe because it improperly deferred to the Tribe. Upon reviewing the record, it becomes clear that Arizona never petitioned this court for review of the dispute resolution ruling, which was a separate action from the redesignation ruling and was published separately in the federal register. Compare 61 Fed.Reg. 56461 and 61 Fed.Reg. 56450. This court's review of Arizona's petition must, thus, be limited to "the findings or report," and the "pleadings, evidence and proceedings" upon which the EPA's redesignation ruling was based. Fed. R.App. P. 16(a).
 
 
 50
 EPA has clearly stated in its published ruling that it based its final rule approving the redesignation solely on the determination that the land at issue was "reservation" land within the meaning of the Act and that the Tribe met the procedural requirements for redesignation. EPA states in its opening brief that it did not rely on the substance of the dispute resolution proceedings. No evidence has been presented that EPA did, in fact, rely on the dispute resolution proceedings in approving the redesignation. EPA properly notes that the dispute resolution proceeding may have led to an outcome that was "consistent" with the redesignation ruling, but it was only the outcome of the dispute resolution proceeding, and not its content, that had a bearing on the final redesignation ruling. Therefore, we dismiss the challenge subsequently raised by Arizona to EPA's implementation of the dispute resolution provisions under 42 U.S.C. § 7474(e) for lack of jurisdiction.
 
 
 51
 AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.
 
 
 52
 FERGUSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 53
 I concur generally with the panel's decision. I write separately, however, because the EPA did not err in concluding that the four disputed parcels were reservation lands. In addition, the EPA properly promulgated the Tribe's redesignation as part of a Federal Implementation Plan ("FIP"). To hold otherwise due to administrative delay effectively wrests from the Tribe the power to control the deterioration of air quality on its lands and undermines Congress' intent in enacting the 1990 amendments to the Clean Air Act ("CAA").
 
 
 54
 I. Designation of Lands Held in Trust as Reservation Lands.
 
 
 55
 The EPA's determination that the Tribe's lands were reservation lands was permissible and should be upheld. Pursuant to Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), this Court applies a two-step procedure for reviewing an agency's construction of the statute which it administers. First, we look to see whether Congress has directly addressed the precise issue at hand. If so, the Court's task is finished since both the Court and administrative agencies must give effect to the unambiguously expressed intent of Congress. Id. at 842, 104 S.Ct. 2778.
 
 
 56
 In this case, Section 7474(c) of the CAA states that "[l]and within the exterior boundaries of reservations of federally-recognized Indian tribes may be redesignated only by the appropriate Indian governing body." 42 U.S.C. § 7474(c). Therefore, if the parcels of land are not within a "reservation," the Indian tribe has no power to redesignate the area as a "Class I" area.
 
 
 57
 The statute does not define the word "reservation." In addition, courts have given inconsistent interpretations of the word throughout the years. See Tooisgah v. United States, 186 F.2d 93 (10th Cir.1950) (holding that "reservation" is not synonymous with "Indian country" for purposes of 18 U.S.C. § 1151, but noting that other courts have used the terms synonymously).
 
 
 58
 Therefore, the statute is ambiguous and we must pass to the second step of Chevron: determining whether the EPA's interpretation is based on a permissible construction of the statute. Id. at 842-43, 104 S.Ct. 2778; see also Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Nance v. Environmental Protection Agency, 645 F.2d 701, 714 (9th Cir.1981). In doing so, because we are dealing with issues affecting an Indian tribe, "ambiguities ... must be resolved favorably to the Indians." Santa Rosa Band of Indians v. Kings County, 532 F.2d 655, 660 (9th Cir.1975) (emphasis added). We thereby "attribute to Congress an intent to exercise its plenary power in the manner most consistent with the nation's trust obligations." Id.
 
 
 59
 In this case, each of the five parcels was acquired by the United States in trust for the Tribe. Although the Secretary of the Interior has never declared the Tribe's lands to be reservation lands, official maps from the Department of the Interior designate the lands as reservation lands. In addition, as part of its review of the Tribe's request for redesignation, the EPA requested a certification from the Interior as to all of the lands within the "boundaries or the reservation or ... within the jurisdiction of the tribe." In response, the Department of the Interior certified all five disputed tracts, listing them under the caption "Camp Verde Reservation, Arizona."
 
 
 60
 The EPA's reliance on these facts in determining that the parcels were indeed part of a reservation is consistent with judicial precedent. Both the Supreme Court and the Ninth Circuit have noted that trust lands set apart for the use of Indian tribes may be considered to be part of a reservation. In United States v. John, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978), the Supreme Court considered whether the state could exercise jurisdiction over crimes committed by Indians on reservation lands. In concluding that it could not, the Court noted that "[t]here is no apparent reason why these lands, which had been purchased in previous years for the aid of those Indians, did not become a 'reservation,' at least for the purposes of federal criminal jurisdiction, at that particular time." Id. at 650, 98 S.Ct. 2541.
 
 
 61
 Similarly, in United States v. Sohappy, 770 F.2d 816 (9th Cir.1985), this Court held that lands held in trust for the benefit of Indian tribes constituted reservation lands for purposes of the Lacey Act. The Court confirmed that United States v. John "suggested that land declared by Congress to be held in trust by the Federal Government for the benefit of the Indians is a reservation." Id. at 822 (internal quotation marks omitted).
 
 
 62
 Given these decisions, the EPA's determination that the Tribe's lands were reservations is permissible and should be explicitly upheld.
 
 
 63
 II. The Federal Implementation Plan.
 
 
 64
 The majority concludes that the EPA abused its discretion by promulgating the Tribe's redesignation as a FIP. The majority correctly notes that Congress has provided for the promulgation of Tribal Implementation Plans ("TIPs"). This Court has previously stated in interpreting an earlier version of the CAA that "[t]he effect of the regulations was to grant the Indian tribes the same degree of autonomy to determine the quality of their air as was granted to the states." Nance, 645 F.2d at 714. The inclusion of TIPs was a similar attempt by Congress to expand the Tribes' authority. See 42 U.S.C. § 7601(d). By remanding for implementation under nonexistent regulations, the majority punishes the Tribe for administrative sluggishness. The autonomy granted to the Tribe by Congress is thus nullified since the Tribe may not act at all until the EPA completes the relatively ministerial task of establishing the regulations guiding promulgation of TIPs.
 
 
 
 [1]
 Compare the requirements for an Environmental Impact Statement under the National Environmental Policy Act. 42 U.S.C. § 4332
 
 
 [2]
 Even if we were to agree with the concurrence that EPA was justified in using an FIP instead of a TIP to avoid delay in implementing the redesignation, EPA still abused its discretion in failing to follow the procedural requirements for issuing an FIP outlined in 42 U.S.C. §§ 7410 and 7607